# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

UNITED STATES OF AMERICA    )
                                    )
v.                                 )    Criminal No. 3:24-cr-114–HEH
                                    )
WESLEY L. COX,               )
                                    )
               Defendant.    )

## MEMORANDUM OPINION
### (Denying Defendant's Motion to Suppress and Granting Motion in Limine)

THIS MATTER is before the Court on Defendant Wesley L. Cox's ("Defendant") Motion to Suppress (ECF No. 33) and Motion in Limine (ECF No. 35), filed on January 7, 2025. Defendant challenges the validity of a series of warrants that led to his arrest and the discovery of a firearm. (*Id.*) He also seeks a *Franks* hearing to further challenge the validity of the warrants. *See Franks v. Delaware*, 438 U.S. 154 (1978).

The parties have filed extensive memoranda supporting their respective positions. The Court held an evidentiary hearing on March 20, 2025, and heard oral argument on April 15, 2025, where the Court denied the Motion to Suppress for the reasons that follow.[1] (Min. Entry, ECF No. 61; Min. Entry at 1, ECF No. 69.)

---

[1] The Motion in Limine was without objection from the Government. Accordingly, the Court granted the Motion in Limine (ECF No. 35) at the initial March 20, 2025 hearing.

# I. BACKGROUND

On November 3, 2023, a group of law enforcement officers consisting of the Henrico County Police Department, the Virginia State Police ("VSP"), and the U.S. Marshals Service executed a search warrant at an apartment in Henrico County where Defendant resided with his girlfriend. Officers recovered a firearm and accompanying ammunition inside the apartment. The search warrant was the third in a set of three (3) warrants issued throughout the investigation into Defendant's alleged criminal behavior. Defendant challenges each warrant.

## A. The First Set of Warrants—The Eight Henrico Arrest Warrants

On September 9, 2023, Henrico Police Department officers responded to two (2) Enterprise Car Rental ("Enterprise") locations following two (2) reports that vehicles had been rented and never returned. Enterprise reported that an individual by the name of "Michael Reu" had rented a 2021 Ford Mustang (the "Mustang") on August 7, 2023, and not returned by its return date of August 14, 2023. Enterprise also reported that an individual by the name of "Bobby Gregory" had rented a 2023 Nissan Altima (the "Altima") on July 15, 2023, and not returned it by its return date of July 17, 2023. Based on these reports, Henrico County Police recorded both vehicles as stolen.

On September 10, 2023, VSP officers performed a traffic stop on a vehicle that matched the stolen Mustang. Defendant was driving the vehicle and was the sole occupant. On Defendant's person, officers found keys to the Mustang, Defendant's Virginia driver's license, and a South Carolina driver's license for an individual named "Michael Reu." The photographs of Defendant's license and "Michael Reu's" license

2

appeared very similar, according to the officers. The officers towed the Mustang and released Defendant without charging him.

Soon thereafter, Detective Richard Valentine ("Detective Valentine"), an investigator with the Henrico Police Department Auto Theft Unit, was assigned to investigate these reports. As part of his investigation, Detective Valentine discovered that the South Carolina driver's license for "Michael Reu," which was found in Defendant's possession, contained personal identifying information that matched an actual South Carolina resident named Michael Reu. However, based on conversations with the real Michael Reu and a South Carolina investigator, Detective Valentine determined that the South Carolina driver's license found in Defendant's possession was fraudulent. Foremost, although the personal identifying information matched the actual Michael Reu, the picture of the real Michael Reu—who is a Caucasian male—did not match the picture on the license found in Defendant's possession—which depicted an African American male—and the real Michael Reu stated that had never rented the Mustang. Additionally, Detective Valentine learned from the South Carolina investigator that the license in Defendant's possession purported to have been issued in 2017, but that particular style of driver's license was not issued until 2018.

Detective Valentine also investigated the rental of the Altima by an individual named "Bobby Gregory." The Detective investigated the personal identifying information on the ID for "Bobby Greogory," which was used in the rental, and the information was found to belong to another individual, Darrick Tucker. Detective Valentine spoke with Darrick Tucker who stated that he had not rented the Altima.

3

Based on this conversation and the mismatch between the name provided and the other personal identifying identification used to rent the Altima, Detective Valentine determined that someone had used a fraudulent identification to rent the Altima.

Around this time, Detective Valentine learned that his partner in the auto theft unit, Detective Letteer, was also investigating a similar case of a stolen vehicle from another Enterprise location. Detective Letteer was investigating a vehicle rented under the name "Tony Styles," although Detective Letteer had concluded that the real Tony Styles had not rented the vehicle from Enterprise.

Because of these series of incidents, Enterprise had begun its own investigation. On October 4, 2023, Enterprise Risk Specialist Lucas Thorton emailed Detective Valentine that Enterprise believed Defendant was the individual who repeatedly rented Enterprise vehicles under fraudulent names—including "Michael Reu," "Bobby Gregory," and "Tony Styles"—and failed to return them. (*See* Gov't Ex. 17A.) Enterprise recounted several instances where an individual they believed to be Defendant rented or attempted to rent a vehicle.

Enterprise relayed to Detective Valentine that Defendant rented a vehicle in May 2023 under his own name, using an Alabama driver's license. That vehicle had to be repossessed, and it happened to be repossessed at the same location where a vehicle rented by "Tony Styles" was also repossessed. On another occasion, an individual under the name "Bobby Gregory" attempted to rent a car using a South Carolina driver's license, but an Enterprise employee recognized the individual as Defendant. Enterprise also shared with Detective Valentine its record of the IP addresses used to book each

4

rental. The IP addresses reflected that while renting Enterprise vehicles (1) "Tony Styles" and Defendant used the same IP address; (2) "Bobby Gregory," "Tony Styles," and Defendant used the same IP address; (3) and "Bobby Gregory" and "Michael Reu" used the same IP address. Enterprise provided documents and photographs to Detective Valentine reflecting this information that it had gathered.

Knowing all this information and believing he had probable cause to support the arrest of Defendant, Detective Valentine sought eight (8) arrest warrants against Defendant for grand larceny (Virginia Code 18.2-95), forging (Virginia Code 18.2-172), identity theft (Virginia Code 18.2-163), and obtaining property by false pretenses (Virginia Code 18.2-78), for conduct related to the renting of the Mustang and Altima. Detective Valentine appeared before Magistrate Dennis Leese, orally provided a sworn probable cause statement, and received the eight (8) arrest warrants signed by Magistrate Leese. Although Detective Valentine did not specifically recall what he told the Magistrate, and no recording or written record exists of his probable cause statement, Detective Valentine generally recalled telling the Magistrate about the connections between "Bobby Gregory," "Michael Reu," and Defendant, including the fraudulent driver's licenses, physical similarities between photographs of "Bobby Gregory," "Michael Reu," and Defendant, the traffic stop of Defendant in the stolen Mustang, and the other information known to him at that time.

### B. The Second Warrant—Real Time Location Data Warrant

After receiving the eight (8) arrest warrants, Detective Valentine sought to locate Defendant to arrest him. VSP Special Agent David Gooding and other officers went to

5

known addresses of Defendant and could not locate him.[2]  To assist locating Defendant,

Detective Valentine applied for a Real-Time Location Data ("RTLD") warrant.  In the

Application, Detective Valentine attested that eight (8) arrest warrants had been issued

for Defendant and measures to locate him have been exhausted.  The RTLD warrant

requested ongoing data production for thirty (30) days, beginning October 14, 2023.  GPS

location pings were produced every ten (10) minutes until Defendant was arrested on

November 3, 2023.  Although officers received regular pings, the location data they

received only provided the general radius that Defendant's phone was located.  Instead of

showing precisely where Defendant was located at a given time, the location data

sometimes reflected that Defendant was located somewhere within a general two (2) mile

radius.  Eventually, after approximately two (2) weeks, Detective Valentine and fellow

law enforcement officers were able to locate a residence that they believed Defendant

frequented.

### C. The Third Warrant—The Final Search Warrant

On November 2, 2023, a team of four (4) officers, including VSP Special Agent

Gooding, VSP Special Agent Matthew Deus, VSP Special Agent Jeremy Cabrera, and

VSP Special Agent James Yarrington conducted surveillance at an apartment complex at

Garden Club Circle.  In the mid-afternoon, Agent Gooding observed Defendant's

girlfriend, Jessica Boney, walk from the parking lot towards Apartment Unit 303.  A

short time later, Agent Gooding observed Defendant drive a Chevy Traverse into the

---

[2] Detective Valentine could not recall what specific addresses officers went to locate Defendant, but he confidently recalled that officers did expend efforts to search.

parking lot.[3]   Defendant exited his vehicle and walked up the stairs towards Unit 303.  At that time, Agent Gooding exited his own vehicle to get a better vantage point to see, eventually stepping up on a curb and using a vehicle to get a higher vantage point.  Agent Gooding was then able to see Defendant arrive on the third floor of the apartment building, walk out onto the breezeway, and round the corner left, towards Unit 303. Agent Gooding heard a door open, saw the lighting in the area change, and heard a door close.  To confirm the location of the unit, Agent Gooding went to the third floor and peeked around the corner.  He determined, based on his observations and the layout of the apartment building, that Defendant had entered Unit 303.  That same day, investigators spoke with the rental office of the apartment complex and learned that Unit 303 was leased by "Von Czernig," who investigators had reason to believe was another alias of Defendant.

Having discovered Defendant's location, Agent Deus applied for a search warrant to search Unit 303.  In his sworn affidavit, Agent Deus detailed the basis for searching the apartment.  In particular, he described the factual basis for believing Defendant had utilized fraudulent driver's licenses with the names of "Bobby Gregory" and "Michael Reu" to rent vehicles which Defendant never returned.  This included details that Defendant was caught driving the stolen Mustang and in possession of a fraudulent driver's license for "Michael Reu."  Agent Deus further described the efforts law

---

[3] Law enforcement checked the vehicle's plates in the DMV system, but they did not return a result.

enforcement had taken to locate Defendant and their observations of Defendant entering Unit 303.

Agent Deus also explained that Defendant was believed to be a member of the "4 Trey gangsta crips" and that law enforcement believed Defendant was stealing vehicles and identities with the intent to promote, further, and assist affiliates of that gang. Moreover, due to the kind of alleged criminal activity in which Defendant was engaging in—i.e., stealing vehicles and producing fraudulent driver's licenses—Agent Deus believed evidence of these crimes, such as stolen vehicle equipment and components, other records of stolen vehicles, photographs, social security cards, or driver's licenses, could be found at Unit 303. In addition to evidence of these crimes, Agent Deus stated that he believed it probable that a search of the apartment would yield information related to other gang activity, including firearms. He further noted that Defendant was linked to several shootings and homicides, which indicated that he had ties to gang activities and firearms.

Based on this information, Defendant's eight (8) outstanding arrest warrants, and the other information contained in the affidavit, Agent Deus requested a warrant to search Unit 303 for evidence of gang association, vehicle and identity theft, and firearms.[4] Upon review of the search warrant application, Henrico County Circuit Court Judge Richard Wallerstein issued a warrant to search Unit 303.

---

[4] Attachment A to the Affidavit for the search warrant—or Attachment B to the search warrant—describes the particular evidence Agent Deus sought.

8

On November 3, 2023, law enforcement executed the search warrant at Unit 303. Defendant was found there and arrested. During the search of the apartment, Agent Deus discovered a firearm in a plastic tub in the back bedroom. Officers also discovered a large amount of U.S. currency and fake IDs in plain view. Since the U.S. currency and fake IDs fell outside the scope of the original warrant, law enforcement sought another warrant to seize those specific items.

## II. LEGAL STANDARD

The Fourth Amendment requires that search warrants and arrest warrants be based "upon probable cause, supported by Oath or affirmation, and particularly describ[e] the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. When a warrant is issued, a reviewing court must accord "great deference to the magistrate's assessment of the facts presented to him," *United States v. Blackwood*, 913 F.2d 139, 142 (4th Cir. 1990), and consider whether the "magistrate had a 'substantial basis' for concluding that probable cause existed," *Illinios v. Gates*, 462 U.S. 213, 238–39 (1983) (quoting *Jones v. United States*, 362 U.S. 257, 271 (1960)). A review of the sufficiency of "probable cause turns on a 'totality-of-the-circumstances analysis' and requires 'a practical, common-sense decision whether . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Gondres-Medrano*, 3 F.4th 708, 714 (4th Cir. 2021) (quoting *Gates*, 462 U.S. at 238).

The Fourth Amendment's particularity requirement prevents law enforcement from obtaining general warrants that allow for a general, exploratory rummaging in a person's belongings." *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971). "The

9

particularity requirement is fulfilled when the warrant identifies the items to be seized by their relation to designated crimes and when the description of the items leaves nothing to the discretion of the officer executing the warrant." *United States v. Williams*, 592 F.3d 511, 519 (4th Cir. 2010). The Constitution permits a "practical margin of flexibility" and thus, the test courts apply "is a pragmatic one: The degree of specificity required when describing the goods to be seized may necessarily vary according to the circumstances and type of items involved." *United States v. Cobb*, 970 F.3d 319, 327 (4th Cir. 2020) (quoting *United States v. Jacob*, 657 F.2d 49, 52 (4th Cir. 1981)).

A defendant is generally prohibited "from attacking [the integrity of] a facially valid affidavit." *United States v. White*, 850 F.3d 667, 673 (4th Cir. 2017) (citing *Franks*, 438 U.S. at 171). The Supreme Court carved out a narrow exception to this general rule in *Franks* that permits a defendant to attack a supporting affidavit when he makes a "'substantial preliminary showing' that the affiant made (1) a false statement (2) 'knowingly and intentionally, or with reckless disregard for the truth' that was (3) 'necessary to the finding of probable cause.'" *Id.* (quoting *Franks*, 438 U.S. at 155–56). However, a defendant must "point out specifically the portion of the warrant affidavit that is claimed to be false." *Franks*, 438 U.S. at 171. Absent an adequate showing under *Franks*, a defendant is not entitled to a hearing to further attack the veracity of an affidavit. However, even if a defendant makes a sufficient showing, if "there remains sufficient content in the warrant affidavit to support a finding of probable cause, [then] no hearing is required." *United States v. Colkley*, 899 F.2d 297, 300 (4th Cir. 1990) (quoting *Franks*, 438 U.S. at 171). Yet "[a] warrant that violates *Franks* is not subject to the

10

good-faith exception to the exclusionary rule announced in *United States v. Leon*, 468 U.S. 897, 923 (1984)." *Id.* (citations omitted).

## III. ANALYSIS

### A. The First Set of Warrants—The Eight Henrico Arrest Warrants

Defendant challenges the eight (8) arrest warrants issued by Magistrate Leese in Henrico County. He contends that since there was no written or otherwise recorded affidavit, the warrants were not supported by adequate probable cause. (ECF No. 67 at 2.) In doing so, Defendant asserts that "[a] federal court hearing a state suppression issue applies Federal law" and, thus, suppression is warranted because neither Detective Valentine nor Magistrate Leese had specific recollection of what was stated.

Defendant is mistaken. In *Clyburn*, the Fourth Circuit made clear that federal law—i.e., Federal Rule of Criminal Procedure 41—"applies only to federal search warrants involving 'a federal law enforcement officer.'" *United States v. Clyburn*, 24 F.3d 613, 616 (4th Cir. 1994) (quoting Fed. R. Crim. P. 41(c)(2)). In other words, Rule 41 only applies where "the warrant application was made 'at the direction or urging of a federal officer.'" *Id.* (quoting *United States v. Williams*, 977 F.2d 866, 870 (4th Cir. 1992)). "No federal officers became involved in this case until after the [arrest] warrant had been executed. Therefore, the procedural requirements of Rule 41 are not applicable." *Id.* In absence of applicable federal law—which can impose greater limitations on law enforcement actions—the Constitution sets the bar. *Id.* And "the Fourth Amendment does not require that the basis for probable cause be established in a

written affidavit; it merely requires that the information provided the issuing magistrate be supported by 'Oath or affirmation.'" *Id.* at 617.

Although Defendant is correct that neither Detective Valentine nor Magistrate Leese had *specific* recollection of what was stated as the basis for probable cause eighteen (18) months prior, Detective Valentine *generally* recalled what was stated and, significantly, Detective Valentine knew precisely what information was known *before* the warrants were issued.[5]  Moreover, Detective Valentine did specifically recall that he was sworn and gave a verbal probable cause statement.  (Hrg. Tr. at 64:5–6, ECF No. 66.)  In that statement, he explained (1) the connections between "Bobby Gregory," "Michael Reu," and Defendant, (2) the fraudulent driver's licenses, (3) the physical similarities between Defendant and "Bobby Gregory" and "Michael Reu," (4) the traffic stop of the Mustang and the discovery of Defendant in possession of a fraudulent driver's license for Michael Reu, (5) the IP addresses which reflected overlap between Defendant's, "Bobby Gregory's," and "Michael Reu's" rentals of Enterprise vehicles.  These facts alone provide ample probable cause to support the eight (8) arrest warrants.[6]  Additionally,

---

[5] Defendant concedes that at the time Detective Valentine obtained the arrest warrants, no written affidavit was required under Virginia law.  (*See* ECF No. 34 at 4 n.1.)  But as the Court noted, Virginia law is irrelevant to the analysis since "evidence admissible under federal law cannot be excluded because it would be inadmissible under state law."  *Clyburn*, 24 F.3d at 616 (quoting *United States v. Pforzheimer*, 826 F.2d 200, 204 (2d Cir. 1987)).

[6] Defendant questions the accuracy of Detective Valentine's memory considering he had no specific recollection of what he told the magistrate.  (*See* ECF No. 67 at 3.)  However, Defendant fails to direct the Court to any authority that would require the Court to then presume the warrants lacked a sufficient basis for probable cause.  The reasonable approach in this Court's view would be to presume that Detective Valentine provided the magistrate with all the information he had at that time, particularly since Detective Valentine stated that it is his practice to review his file before providing a probable cause statement.  It is worth noting that if the Court

12

Defendant cannot direct the Court to any false statement—even generally—and, thus, he is not entitled to challenge the veracity of Detective Valentine's sworn statements.

### B. The Second Warrant—Real Time Location Data Warrant

Defendant asserts that the RTLD was not supported by probable cause and violated Rule 41 and the Fourth Amendment. (*See* ECF No. 34 at 10–15; ECF No. 67 at 3–4.) The Court finds none of these arguments have merit.

First, Virginia Code § 19.2-70.3 provides that a judge or magistrate may issue an RTLD warrant if there is sufficient probable cause (1) that the data sought is relevant to a crime that is being committed or has been committed *or* (2) that an arrest warrant exists for the person whose data is sought. In other words, the statute requires either probable cause or an arrest warrant—which itself must be based on probable cause—for an RTLD warrant to be issued.[7] Detective Valentine had eight (8) valid arrest warrants. (*See* RTLD Warrant at 5, ECF No. 34-2.) In addition to these warrants, Detective Valentine submitted a written affidavit discussing the connection between Defendant and the aliases of "Bobby Gregory" and "Michael Reu," which provided an independent basis of probable cause to obtain an RTLD warrant to locate Defendant. (*See id.*) Therefore, Detective Valentine satisfied both means to acquire a RTLD warrant under Virgina law.

---

took that route, there would be an abundant amount of evidence to establish probable cause for the eight (8) arrest warrants.

[7] The arrest warrants are not limited to the crimes listed in subsection G, as Defendant suggests in his opening brief. *See* Va. Code § 19.2-70.3(G) (noting that "[t]he provisions of this subsection shall only apply" to offenses similar to the enumerated crimes). By its plain language, subsection G pertains to warrants issued by states other than Virginia.

But as the Court previously mentioned, the Fourth Amendment, not Rule 41 or Virginia law, governs the admissibility of "a search warrant which was obtained and executed by State law enforcement officers." *See United States v. Myrick*, No. 3:22-CR-148, 2023 WL 1864873, at *4 (E.D. Va. Feb. 9, 2023) (Hudson, J.) (citing *Clyburn*, 24 F.3d at 616). The Court finds no occasion to hold that an RTLD warrant, such as the one used here, violated the Constitution. To resist this conclusion, Defendant cites to cases which discuss the collection of GPS location data. (*See, e.g.*, ECF No. 34 at 11–12 (citing *In re Application of United States for an Order Authorizing Disclosure of Location Info. of a Specified Wireless Tel.*, 849 F. Supp. 2d 526, 540 (D. Md. 2011)).) However, these cases are distinguishable because GPS location data intrudes into an individual's privacy significantly greater than real-time location data. *See United States v. Knotts*, 460 U.S. 276 (1983). Here, the RTLD warrant provided incredibly general location data. In some instances, all the data reflected was that Defendant was located in a circular area four (4) miles across or anywhere in a thirteen (13) square mile area.[8] (*See* Ex. 13E ("Uncertainty: 3339m").) Receiving this general location data, it was entirely reasonable for law enforcement officers to wait and gather enough data until they were able to sufficiently determine a location they knew Defendant would be and could be

---

[8] Not all of these pings formed an area as large as this example, but this distinguishes RTLD information from precise GPS location. *Compare* (Ex. 13B ("Uncertainty: 1709"); Ex. 13C ("Uncertainty: 960m"); Ex. 13D ("Uncertainty: 2506m"); Ex. 13F ("Uncertainty: 3035") *with*, *In re Application of United States*, 849 F. Supp. 2d at 540 ("GPS technology typically generates location data accurate within a range of approximately ten meters, Blaze Testimony at 21, or within a few centimeters when used in combination with augmentation systems . . . .")

14

arrested safely.  Contrary to Defendant's assertions, nothing in the Fourth Amendment requires officers to disregard all caution and arrest a defendant the moment they can locate him.[9]  (*See* ECF No. 34 at 10–11.)  Therefore, the Court finds that the RTLD warrant was based on adequate probable cause—namely, the eight (8) arrest warrants and the information contained in the affidavit—and was reasonable in scope and length, and thus, compliant with the Fourth Amendment.

Defendant challenges Detective Valentine's affirmation that "[m]easures to locate [Defendant] have been exhausted."  Defendant asserts that this statement was false, since Detective Valentine could have gone to the addresses on file with both of Defendant's probation officers.  In doing so, Defendant seemingly ignores Detective Valentine's statement that although he, *personally*, did not go out and look for Defendant, "others [] went out to try and find him."  (Hrg. Tr. at 28:3–5.)  "[A]gents had gone to known addresses and were unable to locate him."  (*id.* at 28:9–10), and "Agent Gooding did surveillance on . . . [Defendant's] DMV address, at which point he never saw him at that location" (*id.* at 39:10–13).  An affiant is entitled to rely on knowledge of other law enforcement officers, as Detective Valentine did here, and the Court finds no reason to question the integrity of his statements.  Accordingly, Defendant has failed to show that this statement is false, much less that Detective Valentine included it "knowingly and intentionally, or with reckless disregard for the truth."  *White*, 850 F.3d at 673 (quoting

---

[9]  Nor is it reasonable to expect law enforcement to give Defendant a courtesy call and ask him to turn himself in.  (*See* ECF No. 34 at 11 ("There was no statement in this affidavit confirming that a simple telephone call to this phone had been attempted.").)

*Franks*, 438 U.S. at 155–56). Without a greater showing by Defendant, the Court does not question the veracity of the statement.

Finally, as the Government notes, even if the RTLD warrant violated the Fourth Amendment, Defendant provides no reason why the attenuation doctrine would not prevent suppression of the firearm discovered at the apartment. (*See* ECF No. 50 at 8–10.) The law enforcement officers fully complied with Virginia law, which no previous court has questioned on constitutional grounds and, there is no evidence of "official misconduct." *See Utah v. Strieff*, 579 U.S. 232, 239–240 (2016). Ultimately, Defendant cannot escape the fact that he had eight (8) outstanding arrest warrants and "the outstanding arrest warrant[s] for [Defendant's] arrest is a critical intervening circumstance that is wholly independent" of any purportedly unconstitutional tracking of Defendant. *See id.* at 242.

### C. The Third Warrant—The Final Search Warrant

Defendant presents three (3) principal arguments for suppressing the final search warrant. First, he contends that there was not adequate probable cause for Henrico County Circuit Court Judge Wallerstein to issue a search warrant. (ECF No. 67 at 4–5.) Second, he asserts that the warrant was unparticularized. (*Id.*) Finally, he argues that the evidence law enforcement relied on was stale. (ECF No. 24 at 19.) The Court finds these arguments without merit.

The search warrant for Unit 303 was based on adequate probable cause that "contraband or evidence" of unauthorized use of a vehicle, grand larceny, and identity theft would be found in the apartment. (*See* Attachment B, Gov't Ex. 11.) Defendant

16

focuses on the affidavit's description of "gang related activity" and argues that law enforcement's speculation as to Defendant's connection with gang violence cannot support the search of his apartment. (*See* ECF No. 67 at 5.)  While gang membership alone is not a crime, it was reasonable "to believe that evidence regarding [Defendant's] gang affiliation would prove helpful in prosecuting him." *Messerschmidt v. Millender*, 565 U.S. 535, 551 (2012).

The affidavit included a thorough discussion of Defendant's putative gang affiliation—which was believed to be the motive for Defendant's conduct.  Specifically, the Affiant stated that he believed Defendant was stealing vehicles and people's identities with the intent to promote, further, and assist affiliates of a gang.  This could be done by selling stolen vehicles for money or by using the stolen vehicles in crimes—making it difficult to identify the perpetrators.  Law enforcement officers may obtain warrants to search for evidence of Defendant's motive or evidence that "might prove helpful in impeaching [Defendant] or rebutting various defenses he could raise at trial." *Id.* at 551– 52. This may be in the form of gang affiliation. *See id.*  Because Defendant's gang affiliation would have undoubtedly "aid[ed] in . . . [his] conviction," the search warrant could reasonably permit the search for such evidence. *Id.* at 551 (quoting *Warden, Md. Penitentiary v. Hayden*, 387 U.S. 294, 307 (1967)).  However, gang affiliation was far from the sole or principal basis for searching the apartment.

The affidavit also described in detail the connections between "Bobby Gregory," "Michael Reu," and Defendant. (*See supra* Section I.C.)  The Affiant described that on July 15, 2023, Defendant used a fraudulent West Virginia driver's license with the name

"Bobby Gregory" to rent an Altima that was never returned. Then again, on August 7, 2023, Defendant used a fraudulent South Carolina driver's license with the name "Michael Reu" to rent a Mustang that was never returned. Notably, during a traffic stop, Defendant was discovered driving the Mustang and in possession of the fraudulent South Carolina driver's license for "Michael Reu." The Affiant also mentioned that law enforcement officers were investigating Defendant for renting yet another vehicle under the name of "Tony Styles"—a vehicle which law enforcement officers believed Defendant had obtained a washed title for and later sold to an unsuspecting person.

According to Affiant's training, experience, and his conversations with other law enforcement officers, he believed that individuals who engage in stealing cars and identity theft in the manner attributed to Defendant often stored records and documents in their residences. In particular, individuals will maintain records of stolen identities, photographs, social security card numbers, driver's licenses, as well as electronic machines that allow the use of such information in forged documentation. This experience along with the underlying allegations that Defendant used at least two (2) fraudulent driver's licenses to perpetrate his crimes formed adequate probable cause that evidence of those crimes—i.e., records, social security numbers, and machines to make fraudulent driver's licenses—would be discovered at the apartment. This provided sufficient probable cause for law enforcement to conduct a detailed search of Unit 303.

Based on Defendant's gang membership and his previous firearm convictions, the Affiant also believed firearms would be present in the house. Although it is doubtful that gang membership and previous firearm convictions alone could provide sufficient

18

probable cause that firearms would be present in the apartment, any inadequacy in probable cause for firearms was innocuous. Law enforcement officers certainly had sufficient probable cause to search the apartment for evidence related to vehicle and identity theft and gang affiliation, and this permitted law enforcement officers to conduct a detailed and in-depth search of the premises. Knowing Defendant was a convicted felon, any firearm law enforcement officers discovered during that search could undoubtedly be seized, whether or not firearm allegations were identified in the search warrant. Thus, based on the review of the record, the Court finds that law enforcement provided adequate probable cause to Circuit Court Judge Wallerstein to search Unit 303.

Next, Defendant challenges the particularity and overbreadth of the warrant. Defendant argues that the warrant was "unparticulized in any way, and without restriction" because law enforcement "had unlimited discretion to forensically search even the most protected personal information on unknown thumb drives, belonging to unknown owners, all on the notion of a 'possibility.'" (ECF No. 67 at 5.)

"[W]hat 'particularity' demands . . . is that the executing officer reasonably can ascertain and identify from the warrant the place to be searched and the items to be seized." *United States v. Blakeney*, 949 F.3d 851, 861 (4th Cir. 2020). Attachment A expressly laid out the particular items law enforcement could search, including records, documents, articles, computers, cell phones, tablets, and other electronic devices, and firearms, which met the specific subject matter parameters such as containing gang affiliation or personal identifying information, among others. The Court finds that the search warrant was sufficiently particular that law enforcement was "able to distinguish

19

between those items which are to be seized and those that are not."[10]  *Id.* (quoting *United States v. Dickerson*, 166 F.3d 667, 693 (4th Cir. 1999), *rev'd on other grounds by*, 530 U.S. 428 (2000)).

A search warrant may only be as broad as the underlying probable cause permits. *See United States v. Oloyede*, 982 F.2d 133, 138 (4th Cir. 1992) ("[The particularity] requirement ensures that the search is confined in scope to particularly described evidence relating to a specific crime for which there is probable cause."). Here, the search warrant provided probable cause that evidence related to Defendant's vehicle and identity theft would be found in the apartment. This included evidence of Defendant's gang affiliation, which law enforcement believed was the principal motivator behind Defendant's alleged criminal activity. Law enforcement was therefore entitled to search for the articulated items of criminal activity, and the search warrant "affidavit constrained the scope of the possibly broad categories enumerated in the warrant through phrases of limitation referencing the underlying alleged crimes. The other categories of items either clearly related to the alleged crimes or were susceptible to the reasonable inference that evidence pertinent to the alleged crimes would be contained therein." *United States v. Strange*, No. 5:20-CR-217-FL-4, 2021 WL 3193179, at *9 (E.D.N.C. July 28, 2021). Defendant argues that under the terms of the search warrant, law enforcement officers

---

[10] Although the Court assesses the sufficiency of a search warrant independent of the subjective viewpoint of the law enforcement officers who executed the warrant, law enforcement officers executing the search warrant notably obtained an additional search warrant to seize U.S. currency and ID cards which were found in the search. This action demonstrates that the officers believed the initial warrant did not cover these items and "distinguished between those items which are to be seized and those that are not." *Id.*

could search every square inch of the apartment in search of a thumb drive which contained information related to identity theft and gang affiliation. A search warrant may permit broad searching so long as the search warrant "was not broader than the probable cause upon which it was based." *Id.* Here, the Court finds that the search warrant was no broader than it was constitutionally permitted to be.

Finally, Defendant contends that the evidence law enforcement officers relied upon in obtaining the search warrant was stale. (ECF No. 49 at 16.) Law enforcement officers responded to reports of stolen vehicles from Enterprise on September 9, 2023 for rentals that occurred on August 7, 2023, and July 15, 2023. The following day, Defendant was arrested while driving the stolen Mustang and *still in possession* of the fraudulent South Carolina driver's license for "Michael Reu," which was used to rent the vehicle one (1) month prior. Law enforcement obtained arrest warrants for Defendant approximately one (1) month later in October 2023. Another month later, after finally locating Defendant, law enforcement obtained a search warrant for Unit 303. Nothing in this timeline of events suggests that the evidence "was too old to provide 'present' probable cause," particularly where law enforcement was actively engaged in locating and arresting Defendant. *See United States v. Blizzard*, 313 F. App'x 620, 621 (4th Cir. 2009).

### D. Good Faith Exception

Even if the warrants were invalid, the Court has no reason to believe that the police deliberately, recklessly, or grossly negligently disregarded the Fourth Amendment. *See Herring v. United States*, 555 U.S. 135, 144 (2009). Instead, by all accounts, the law

enforcement officers in this case "act[ed] with an objectively 'reasonable good-faith belief' that their conduct is lawful." *Davis v. United States*, 564 U.S. 229, 238 (2011) (quoting *Leon*, 468 U.S. at 909 (1984)). Law enforcement obtained four (4) sets of warrants, the additional fourth being for the U.S. currency and fake IDs discovered during the final search, and Defendant has presented no evidence that suggests law enforcement intentionally or recklessly made false statements. Moreover, there is no indication that any issuing magistrate or judge "wholly abandoned his judicial role." (ECF No. 49 at 20 (citing *Leon*, 468 U.S. at 923).) Magistrate Leese was duly authorized to approve arrest warrants and Defendant has offered no proof that he disregarded his judicial role. Accordingly, even if law enforcement erred, nothing in the record suggests that suppression would be warranted. *See Davis*, 564 U.S. at 238–39.

### E. *Franks* Hearing

It is unclear to what extent Defendant continues to rest on his request for a *Franks* hearing.[11] However, to the extent that Defendant maintains his request, the Court finds he has not made a "'substantial preliminary showing' that the affiant made (1) a false statement (2) 'knowingly and intentionally, or with reckless disregard for the truth' that was (3) 'necessary to the finding of probable cause.'" *White*, 850 F.3d at 673 (quoting *Franks*, 438 U.S. at 155–56). Defendant failed to "point out specifically the portion of the warrant affidavit that is claimed to be false." *Franks*, 438 U.S. at 171. Instead,

---

[11] The Court also questions what further success Defendant could hope to achieve with another evidentiary hearing. Most, if not all, of the questioning Defendant could hope to gain was covered in the evidentiary hearing the Court already held.

Defendant attacks the general premise that the precise sworn statement is not available. But as the Court has already discussed, there is no merit to this argument. *See supra* Section III.B.  Without making an adequate showing, Defendant is not entitled to a *Franks* hearing.

## IV.  CONCLUSION

In sum, for all the foregoing reasons, the Motion to Suppress (ECF No. 33) will be denied and the unopposed Motion in Limine (ECF No. 35) will be granted.

An appropriate Order will accompany this Memorandum Opinion.

/s/

Henry E. Hudson
Senior United States District Judge

Date: May 30, 2025
Richmond, Virginia

23